IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH A. BEHANNA, )
)
    Plaintiff, )
)
vs. ) Civil Action No. 09-0241
)
MONONGAHELA VALLEY HOSPITAL, )
)
    Defendant. )
)

AMBROSE, District Judge

**OPINION AND ORDER**

**Synopsis**

Plaintiff Deborah A. Behanna ("Behanna") brings this action alleging a violation of the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"). Defendant has moved for summary judgment on all counts. For the reasons set forth below, I grant Defendant's motion for summary judgment.

**I. Legal Standard**

In order to succeed on a motion for summary judgment, a moving party must demonstrate that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. A fact is material when it might affect the outcome of the suit under the governing law." Scott v. Airtran Airways, Inc., No. 05-1123, 2006 WL 2711654, at *2 (W.D. Pa., 2006); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the party moving for summary judgment will not bear the burden of

1

proof at trial, it may meet its initial burden by showing that the evidence on record would not be sufficient for a reasonable jury to find in the non-movant's favor. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Once the party moving for summary judgment has carried the initial burden . . . , the nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact. Instead, it must 'make a showing sufficient to establish the existence of every element essential to its case . . . .'" Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)). "A nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." Williams v. Borough of West Chester, Pa, 891 F.2d 458, 459 (3d Cir. 1989). "Thus an opponent may not prevail merely by discrediting the credibility of the movant's evidence; it must produce some affirmative evidence." Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993). Rule 56 requires the granting of a motion for summary judgment after adequate time for discovery against the party who fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Scott, 2006 WL 2711654, at *1 (quoting Celotex, 477 U.S. at 322).

**II. Statement of Relevant Facts**

Behanna has been a nursing assistant at Defendant Monongahela Valley Hospital (the "Hospital") since March 17, 1975. Her primary job duty is to work with and assist patients in the hospital. [Docket No. 37, at 2.] Behanna does not claim to have been subjected to any type of disability discrimination prior to December 2007. [Docket No. 31-1, at 44.]

Behanna's uncle, a patient at the hospital, fell on November 30, 2007 during occupational therapy. His fall resulted in a fractured hip. Behanna felt that the hospital acted negligently with regard to her uncle's care. [Docket No. 31-1, at 45.] She was upset and spoke with her supervisors about the incident. [Id.]

During the week of December 3, 2007, Behanna was scheduled to work the night shift from 11:00pm to 7:00am. [Id.] Behanna was emotional and tearful at work on the morning of December 5. [Id. at 46.] Coworkers reported that she was crying heavily and was upset. [Id. at 16.] On the evening of December 5, 2007, Behanna called in sick for her shift because of a sinus infection. [Id. at 48.] She was off from work due to this illness for the next three scheduled shifts.

Behanna called the hospital as many as 20 times during the time that she was away from work in order to check on the status of her uncle and to talk to coworkers. [Id. at 46.] She stated that she called frequently because she was not able to speak with the nurse on duty in charge of her uncle's care and to "find out how [her coworkers'] night was going" during their "not-so-busy time." [Id. at 46, 47.] On December 7, 2007, Betty Geis ("Geis"), Behanna's Nurse Manager, spoke with Behanna and asked her not to call hospital staff while they were working. [Docket No. 30, at 2.] Behanna agreed to stop calling. [Id.] Geis also expressed concern regarding Behanna's emotional state. Geis memorialized this conversation in an email to Marge Mooers ("Mooers"), Assistant Vice President of Nursing, and Georgina Koslosky ("Koslosky"), Employee Health Nurse, observing that Behanna was upset and emotional and that she was making frequent phone calls to staff members during the evening hours, but had agreed to discontinue these calls. [Docket No. 31-1, at 16.]

3

Because she had missed three scheduled shifts, hospital policy required that Behanna obtain a return to work authorization from her treating physician. [Docket No. 30, at 2-3.] Behanna was seen by her primary care physician, Dr. Gosai, on December 11, 2007. [Docket No. 31-1, at 21.] She was diagnosed with sinusitis and high blood pressure. [Id.] While there, Behanna reported observing a note in her medical file stating that an anonymous caller had asked Dr. Gosai to evaluate her for potential emotional problems. [Id.] Behanna believed that Koslosky was responsible for this anonymous call to Dr. Gosai. [Id. at 51.] Behanna obtained a return to work authorization slip that was signed by Dr. Gosai's secretary. [Docket No. 37, at 6.]

On December 12, 2007, Mooers sent an email to Koslosky relaying reports of Behanna's erratic behavior prior to her sick leave as well as reports of frequent phone calls from Behanna to various units within the hospital. [Docket No. 31-1, at 19.] Mooers suggested in this email that the hospital require that Behanna be evaluated before allowing her to care for patients as a result of this behavior. [Docket No. 31-1, at 19.]

Also on December 12, 2007, Behanna and Union President Mike Jurcevich delivered her return to work authorization to Koslosky. [Id. at 51.] However, since the document had not been signed by her treating physician, Koslosky did not accept this authorization. [Docket No. 30, at 3.] She told Behanna that she must present written authorization signed by her treating physician or physician's assistant in order to return to work. [Id.] Koslosky also encouraged Behanna to see her doctor. [Docket No. 31-1, at 70.] Behanna does not dispute the Hospital's policy requiring any return to work authorization to be signed by a physician or a physician's assistant. [Id. at 48.]

Behanna conceded that she was upset during this meeting with Koslosky because of the note that she had reported seeing in her medical file at her physician's office. [Docket No. 31-1,

4

at 51.] The meeting became contentious and Behanna left to get her husband. [Id.] David Clark, Vice President of Human Resources ("Clark"), Geis, and Behanna's husband joined Behanna, Koslosky, and Jurcevich in the meeting. At this time, both Koslosky and Clark expressed concern about Behanna's ability to perform her job duties. [Docket No. 30, at 3.] Behanna was told that before she could return to work she had to obtain a release from her doctor and it was suggested that she be examined by the Hospital's Employee Health Medical Director, Kevin Vrablik. [Id.] Behanna declined to be examined by Dr. Vrablik at that time, preferring instead to see Dr. Gosai. [Docket No. 31-1, at 52.]

A second note was placed in Behanna's medical file, allegedly as a result of a phone call from Koslosky to Dr. Gosai's office. [Docket No. 31-1, at 25.] This note states that Behanna's employer called because the return to work authorization brought to the hospital by Behanna could not be accepted. [Id.] It lists Koslosky's first name and phone number. [Id.] This note also states that Behanna came to the Employee Health Department "yelling and causing a scene" and that the nurse felt she could not allow Behanna to return to work while displaying this behavior. [Id.]

On or about December 26, 2007, Behanna called the hospital to request that Koslosky initiate a workers' compensation claim on her behalf. [Docket No. 31-1, at 53.] She asserted that the Hospital was preventing her return to work due to perceived emotional problems. [Id.] Koslosky refused to do so, stating that this situation was not a workers' compensation issue. [Id.]

Behanna remained on medical leave until March 3, 2008.[1] During this time, Behanna's husband also took time off from work in order to care for her. Behanna stated that he took this time away from his trucking business because "he was afraid to leave [her] alone" and "wanted to make sure that [she would] get to her doctor's appointments." [Docket No. 31-1, at 56.]

Behanna and her husband returned to the hospital for a meeting with Koslosky on January 10, 2008. They discussed how Behanna was feeling and when she planned to return to work. [Id. at 54.] Also on January 10, Koslosky contacted Dr. Gosai to express concern about Behanna's emotional health. [Id. at 68.] During this conversation Dr. Gosai stated that he was addressing Koslosky's concerns and that Behanna had expressed hostility toward Koslosky. [Id.] He therefore suggested that someone other than Koslosky try to speak with Behanna about these concerns. [Id.]

At the end of February 2008, Behanna presented a note from Dr. Gosai to the Hospital, dated February 21, 2008, stating she had been under his care since December 5, 2007 and would be able to return to work on March 3, 2008. [Docket No. 31-1, at 32.] Behanna was also seen by Dr. Urrea, who approved her March 3 return. [Id. at 34.] Behanna has stated that she was absent for this entire period of time due to sinusitis. [Id.]

Behanna returned to work on March 3, 2008 as scheduled. [Docket No. 30, at 4.] She received 55% of her pay from December 5, 2007 through March 3, 2008 under the hospital's sickness and accident policy. [Id.] Sinusitis and URI are the diagnoses listed on the sickness and accident claim form. [Docket No. 31-1, at 36.] Behanna testified in her deposition that between March 2008, when she returned to work, and March 2009, the Hospital did not commit any acts of discrimination against her. [Docket No. 31-1, at 56.]

---

[1] There are several discrepancies between the dates to which the Plaintiff has testified and those elsewhere in the record. The majority of the record suggests that Plaintiff returned to work on March 3, 2008. In any event, these minor discrepancies do not affect my analysis of the claims.

Behanna filed an EEOC Charge of Discrimination in August 2008. [Id. at 5.] The EEOC Charge discussed the events of December 2007 through March 2008 and the subsequent alleged workplace hostility through August 2008.[2] [Id.] In the Charge, Behanna states that she "stayed off until March 10, 2008 because of high blood pressure that would not come down due to work related stress." [Id. at 9.] She also states that the hospital "wanted to make [her] out to be unstable because [she] was a witness to their negligence and [her] being outspoken in the best interest of her uncle…" [sic] [Id. at 8.] Behanna stated in her deposition that she believes that the hospital "knowingly and falsely created the impression that [she] [was] having emotional problems" and that the hospital was aware that she had no disability but intentionally created the impression that she did. [Id. at 58, 59.]

### III. Defendant's Motion for Summary Judgment

#### A. Plaintiff's Claim for Disability Discrimination Under the ADA[3]

Courts apply the burden-shifting framework applicable to cases brought under Title VII of the Civil Rights Act in analyzing claims brought under the ADA. Stouch v. Twp. Of Irvington, 354 Fed. Appx. 660, 666 (3d Cir. 2009). This framework has three steps: (1) the plaintiff bears the burden of establishing a *prima facie* case of discrimination; (2) the burden then shifts to the defendant, who must offer a legitimate non-discriminatory reason for the action; and (3) if the defendant satisfies this burden, the plaintiff must then come forth with evidence

---

[2] In her reply brief, Plaintiff also alleges discriminatory and retaliatory actions after August 2008. These additional claims were not included in an EEOC Charge nor were they included in her Complaint. Accordingly, these allegations are not part of this litigation and will not be considered by me. See EEOC v. Wyeth Pharm., No. 03-2967, 2004 WL 503417, at *3 (E.D. Pa. Mar. 11, 2004) (plaintiff may not assert new allegations in her brief in opposition to summary judgment where none of the claims were included in her EEOC charge or her complaint).

[3] The Third Circuit Court of Appeals applies the same analysis to disability discrimination claims under the PHRA as those under the ADA. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) ("While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts"). Thus, for purposes of Defendant's motion, my holding with respect to Plaintiff's ADA claim applies equally to her PHRA claim.

indicating that the defendant's proffered reason is merely a pretext. Id. In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate that (1) she is a disabled person within the meaning of the ADA, (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and that (3) she has suffered an adverse employment decision as a result of discrimination. Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). The burden initially rests upon Plaintiff to establish the three elements of a *prima facie* case of discrimination in order to defeat a motion for summary judgment.

Defendant argues that Plaintiff has failed to establish that she is a disabled person within the meaning of the ADA. (Def.'s Br. at 17.) I agree.

"Disability" is defined by the ADA as an individual with a (1) physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. 42 U.S.C.A. § 12102(1). Plaintiff contends that she falls under the third prong of this definition. (Pl.'s Opp. Br. at 12.) Accordingly, in order to establish the first element of a *prima facie* case, Plaintiff must demonstrate that Defendant actually perceived her as having a permanent disability that prevented her from performing a wide array of jobs. See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 380-81 (3d Cir. 2002) (perceived condition must be permanent and employer must believe that condition prevented employee from performing a wide array of jobs).

Plaintiff's EEOC Charge and sworn deposition testimony facially contradict her argument and defeat her claim for disability discrimination. During her deposition, Plaintiff testified that defendant "knowingly and falsely created the impression that [she] was having emotional problems," and agreed that that was the theory of her complaint in this action.

8

[Docket No. 31-1, at 58.] She further testified that "the hospital was aware that [she] had no disability but intentionally created the impression that [she] did." [Id. at 59.] In her EEOC Charge, Plaintiff stated that defendant "wanted to make me out to be unstable because I was a witness to their negligence and my being outspoken in the best interests of my Uncle and other patients at the hospital was seen as a big threat to 'The Journey to Excellence'" and that "I was being retaliated against for not giving in to the quid pro quo of the mental illness label they were trying to put on me to cover up their own negligence." [Id. at 8]. Thus, according to Plaintiff's own statements, Defendant did not "perceive" her as disabled, but rather falsely and intentionally accused her being disabled in retaliation for her complaints about her uncle's treatment. Plaintiff relies upon Taylor v. Pathmark Stores, Inc., 177 F.3d 180 (3d Cir. 1999) to support her assertion that she falls under the third prong of the ADA's "regarded as" test. Such reliance is misplaced, because in Taylor, the plaintiff asserted that the defendant employer *actually perceived* him as being disabled as a result of an incorrect reading of a medical chart. Taylor, 177 F.3d at 188. Accordingly, Plaintiff, by her own admissions, cannot satisfy the first prong of a *prima facie* case of discrimination.

Even if Plaintiff had demonstrated that Defendant perceived her as disabled, Plaintiff has failed to put forth any evidence to suggest that Defendant regarded her as being *permanently* disabled, as required by the Third Circuit. Rinehimer, 292 F.3d at 380-81. If there was a perception of a permanent condition, then Plaintiff must show that Defendant believed she could not perform a wide array of jobs either permanently or for an indefinite duration. Id. at 382. Both parties have agreed that Plaintiff returned to her normal job duties on March 3, 2008 when she submitted her return to work slip signed by a doctor. [Docket No. 37, at ¶ 31]. Rather than demonstrating a belief in a permanent or indefinite disability, the record indicates that Defendant

9

simply required a doctor's confirmation that Plaintiff was capable of returning to work after a finite illness.

Nor can Plaintiff satisfy the third prong of her *prima facie* case, that she suffered an adverse employment action as a result of the discrimination. In order to survive summary judgment, "the adverse employment action must be sufficiently severe and concrete to affect the 'compensation, terms, conditions, or privileges' of employment." Sconfienza v. Verizon Pa. Inc., 307 Fed. Appx. 619, 621 (3d Cir. 2008). It is undisputed that Plaintiff was out of work between December 5, 2008 and March 3, 2009 with sinusitis. Once she presented a doctor's note stating that she was cleared to return to work, she was permitted to return to work. She applied for and collected 55% of her normal pay during this period under Defendant's sickness and accident benefit policy. While she makes unsubstantiated allegations that her co-workers treated her differently after her return, she admits that she has no basis for believing that this occurred as a result of any action taken by the Hospital. [Docket No. 31-1, at 60.] Indeed, she admits that there were no negative steps taken against her by the Hospital after her return to work. [Id. at 57-58.] The fact that her husband may have taken off from his employment during this period does not constitute an adverse employment action by the Hospital against her.

Plaintiff raises a host of irrelevant issues in an attempt to craft a discrimination claim. For instance, while not questioning Defendant's right to require a medical examination prior to her return to work, Plaintiff nevertheless argues that it was unnecessary and unreasonable. (Pl. Opp. Br. at 15-16)[4]. EEOC regulations allow an employer to "require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." 29 C.F.R. § 1630.14(c); *see also* 42 U.S.C.A. § 12112 (d)(4)(A, B) ("A covered entity may make

---

[4] Plaintiff relies heavily on the alleged fact that Defendant required her to submit to multiple medical evaluations. (Pl. Opp. Br. at 16, 20) However, only the medical examination that occurred in December 2007 is relevant to the scope of this action. See footnote 1, *supra*.

10

inquiries into the ability of an employee to perform job-related functions"). Defendant's submissions include affidavits from several members of the hospital management team expressing concern about Plaintiff's ability to perform her job duties as a nursing assistant, specifically her ability to provide care to patients. [Docket No. 31-1, at 14, 18, 27.] Koslosky testified that Plaintiff's behavior had raised concerns about her safety and the safety of patients. [Id. at 70.] Additionally, Plaintiff admitted to being emotional and upset at work and to making frequent phone calls to the hospital while off duty. [Docket No. 37, at 3.] Under such circumstances, it is reasonable for an employer to request an independent medical examination in order to ensure the safety of its patients. See Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 515 (3d Cir. 2001) (although the employee's treating physician had provided a written statement that employee could perform his duties, transportation authority's request for a medical examination was reasonable to ensure the safety of its passengers).

The Third Circuit Court of Appeals has held that "[u]nder [ADA] standards, a request for a [medical examination] that complies with the statutory restrictions will never, in the absence of other evidence, be sufficient to demonstrate that an employer 'regarded' the employee as substantially limited in a major life activity, simply because an examination that is 'job-related' and 'consistent with business necessity' must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue." Tice, 247 F.3d at 515. The court then went on to explain that such a request only evidences *doubt* on the part of an employer with respect to whether the employee could perform a particular job, and that doubts do not demonstrate that an employee was "held in any particular regard." Id. As such, Plaintiff may not rely solely on the Hospital's request for a medical examination in order to demonstrate that it "regarded" her as

11

disabled. Indeed, in Pennsylvania State Troopers Ass'n v. Miller, 621 F. Supp.2d 246, 252 (M.D. Pa. 2008), a case relied upon by Plaintiff, the court explicitly recognized that business necessity includes ensuring that an employee is emotionally fit to perform his or her duties. [5]

**B.     Plaintiff's Additional Allegations**

To the extent that Plaintiff has asserted claims under the ADA for retaliation and hostile work environment, such claims are also without merit. "To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997). Plaintiff's allegation that she was retaliated against for complaining about her uncle's treatment is not the sort of employee activity protected by the ADA. See Stouch, 354 Fed. Appx. at 667. Nor does the record reflect any adverse action taken against Plaintiff -she was permitted to return to work after she was cleared by a doctor, and she admitted that there were no instances of discrimination against her by the hospital once she returned. Similarly, in order to prevail on a hostile work environment claim under the ADA, Plaintiff must demonstrate that she was perceived as disabled and suffered severe and pervasive harassment as a result. See, e.g., Walton v. Mental Health Ass'n of SE PA, 168 F.3d 661, 667 (3d Cir. 1999). Given Plaintiff's admissions that the Hospital did not actually believe her to be disabled, and that she suffered no adverse actions upon her return to work, to the extent Plaintiff has a claim for hostile work environment, it is unsupported by the record.

---

[5] Plaintiff mistakenly cites Polini v. Lucent Technologies, 100 Fed. Appx. 112 (3d Cir. 2004), in support of her proposition that a nurse's determination of whether Plaintiff was fit to return to work, rather than management's, defeats Defendant's motion for summary judgment. The Third Circuit in Polini merely held that there was an issue of fact as to who the relevant decisionmaker was and whether that decisionmaker perceived the plaintiff as disabled.

## Conclusion

Plaintiff has failed to meet her burden of establishing a *prima facie* claim of discrimination, retaliation or hostile work environment under the ADA. Accordingly, Defendant's motion for summary judgment is GRANTED.

## ORDER OF THE COURT

AND NOW, this 22nd day of October, 2010, having carefully considered Defendant's motion for summary judgment [Docket Nos. 28-31], Plaintiff's response thereto [Docket Nos. 34, 35, 37], and Defendant's reply [Docket No. 38], for the reasons set forth in the accompanying Opinion, Defendant's motion for summary judgment is Granted.

By The Court:


s/ Donetta W. Ambrose
Donetta W. Ambrose
U.S. District Judge